ORIGINAL

JUDGE FAILA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA                    :        **SEALED INDICTMENT**

            - v. —                          :        24 Cr.

BEHNAM SHAHRIYARI,                          :
  a/k/a "Seyed Aliakbar Mirvakili,"         :
  a/k/a "Husain,"                           :
  a/k/a "Huseyini Hamid,"                   :
  a/k/a "Seyed Hamid Reza Shahcheraghi,"    :
MORTEZA ROSTAM GHASEMI,                     :        **2 4 CRIM       44**
MOHAMMADREZA ALIAKBARI,                     :
  a/k/a "Captain Aliakbari,"                :
  a/k/a "Abu Emad,"                         :
MOHAMMAD SADEGH KARIMIAN,                   :
SITKI AYAN,                                 :
BAHADDIN AYAN, and                          :
KASIM OZTAS,                                :

                    Defendants.            :

------------------------------------------------------------x

## BACKGROUND

1.      The charges in this Indictment arise out of a global, long-running scheme by the Government of the Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps ("IRGC") to fund the Government of Iran and the IRGC through black-market sales of Iranian crude oil and other petroleum products produced by the National Iranian Oil Company ("NIOC"). The buyers in these IRGC-orchestrated black-market oil deals include entities in the People's Republic of China ("China") and the Russian Federation ("Russia"), and the Bashar al-Assad regime in Syria, which has operated through and been facilitated by sanctioned arms of the Syrian Government, including the Central Bank of Syria, the Syrian Petroleum Marketing Department ("SYTROL"), and the Banias Refinery Company.

2.      Since 2018—when U.S. sanctions relating to the sale of Iranian oil were imposed in response to the threat to international peace and security posed by the Government of Iran and its malign policies and actions in the Middle East and worldwide, including the Government of Iran's continued potential capability to reconstitute its nuclear-weapons program— the IRGC, a designated Foreign Terrorist Organization ("FTO"), has organized and directed a large-scale sanctions-evasion scheme to launder NIOC crude oil for sale in international markets.

3.      The IRGC has partnered with complicit individuals and entities in neighboring countries to facilitate the black-market sales, including to conceal the Iranian origin of the oil, to conceal the IRGC's role in the transactions, and to carry out financial and shipping transactions on the IRGC's behalf.  This scheme to launder Iranian oil requires and has involved the widespread use of front companies, intermediaries, falsified transactional documentation, the manipulation of shipping records and transponder signals, and other deceptive conduct.

4.      Rostam Ghasemi, a/k/a "Commander Ghasemi," a/k/a "Sardar Ghasemi" ("Commander Ghasemi"), a co-conspirator not charged herein;[1] BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi,"    MORTEZA    ROSTAM    GHASEMI,    Commander    Ghasemi's    son; MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad,"  and MOHAMMAD SADEGH KARIMIAN, the defendants, have been central in organizing the IRGC's oil-laundering scheme.  Commander Ghasemi, a Commander in the IRGC's Qods Force ("IRGC-QF"), assisted by his son MORTEZA ROSTAM GHASEMI; SHAHRIYARI, a senior officer in the IRGC-QF; ALIAKBARI, an Iranian tanker shipping official; and KARIMIAN, an

---

[1] According to publicly reported news information, Commander Ghasemi died on December 8, 2022.

IRGC-QF agent; have worked with individuals and companies located outside Iran—including in Turkey, Greece, Oman, the United Arab Emirates ("U.A.E."), Russia, and India—to transport Iranian-produced crude oil and petroleum products from Iran to other countries and to act on Iran's behalf as the counterparties in purchase and sale transactions designed to conceal Iran's involvement.

5.     The ASB Group of companies in Turkey, headed by SITKI AYAN ("AYAN"), the defendant, and operated by AYAN, his son BAHADDIN AYAN, the defendant, and KASIM OZTAS, the defendant, is one of the key intermediaries acting on the IRGC's behalf. The ASB Group is a group of affiliated Turkish companies operating in the oil and gas and shipping industries.     Working with Commander Ghasemi and MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," the defendant, the ASB Group has been central in organizing and facilitating the IRGC's oil-laundering scheme.  The ASB Group, together with co-conspirators, has chartered, or hired, oil tankers to transport Iranian-origin crude oil from Iran to buyers in China.  By partnering with other companies based in the Middle East and Mediterranean and using falsified transaction paperwork, the ASB Group has helped the IRGC disguise the Iranian origin of the crude oil and the IRGC's role in the crude oil transactions.  The ASB Group and its co-conspirators also have manipulated ship transponder data and used ship-to-ship transfers to transport the oil, making it more difficult to trace the origin of any particular crude oil delivery back to Iran.  As part of the IRGC oil-laundering scheme, the ASB Group has caused millions of dollars' worth of wire transfers through the U.S. banking system.  As a result of the scheme, the IRGC has been able to sell millions of barrels of crude oil to buyers in China.

6.     Another group of companies based in India, the U.A.E., and Lebanon functions as an additional key set of intermediaries used by Commander Ghasemi and

MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," the defendant, to launder Iranian-origin crude oil for the IRGC.  These companies have purchased and chartered oil tankers to transport Iranian-origin crude oil from Iran to Syria for the Syrian Government.  By using companies based in India, the U.A.E., and Lebanon as intermediaries and using false transaction paperwork, the co-conspirators sought to conceal the Iranian origin of the crude oil. The co-conspirators also lied about the tankers' destination in order to conceal that the crude oil was being delivered to the Government of Syria.  In furtherance of the scheme, the co-conspirators caused wire transfers through the U.S. banking system for payment of crew salaries, crew management fees, and canal transit fees for tankers carrying Iranian crude oil, and were able to deliver millions of barrels of Iranian crude oil to the Syrian Government.

7.     Another group of companies based in Russia, the U.A.E., and Cyprus functions as a further key set of intermediaries used by Commander Ghasemi, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," and MOHAMMAD SADEGH KARIMIAN, the defendants, to launder Iranian-origin crude oil for the IRGC.  These companies have chartered oil tankers to transport Iranian-origin crude oil and petroleum products from Iran to Russia, China, and elsewhere. KARIMIAN and these intermediary companies sometimes partnered with the ASB Group companies operated by SITKI AYAN, the defendant, to facilitate the sale and transportation of Iranian-origin crude oil for the benefit of the IRGC. By using companies based in Russia, the U.A.E., and Cyprus, the co-conspirators sought to conceal the Iranian origin of the crude oil and petroleum products.  The co-conspirators also lied about the tankers' loading ports in order to conceal that the oil and petroleum products were Iranian-origin and used false documentation to misrepresent the oil as Omani or Iraqi origin.  These companies sometimes engaged in trade-based

money laundering, using sales of agricultural products to finance the purchase of Iranian-origin crude oil and petroleum products, and also engaged in wire transfers through the U.S. banking system to pay for the purchase and transportation of the oil.  Through this aspect of the scheme, the co-conspirators were able to deliver millions of barrels of Iranian crude oil and petroleum products to Russia, China, and elsewhere.

## IRGC-QODS FORCE COMMANDER ROSTAM GHASEMI

8.      IRGC Commander Ghasemi, an Iranian national, played a key role in these IRGC-orchestrated black-market oil sales.  Commander Ghasemi was designated as a Specially Designated National ("SDN") under multiple U.S. national security executive orders and regulations, including those relating to weapons of mass destruction and global terrorism. Commander Ghasemi was for many years a central figure in the Government of Iran's and the IRGC's systematic sanctions-evasion efforts.  As alleged more fully below, in 2012 and 2013, while Commander Ghasemi was also the Iranian Minister of Petroleum, he worked with Iranian oil and banking officials to organize a multi-billion-dollar money-laundering scheme to give the Government of Iran unrestricted access to sanctions-restricted money held at a state-owned bank in Turkey.

9.      Beginning in at least 2018, Commander Ghasemi directed the IRGC's oil-laundering efforts.  Through his role as the head of the Iranian-Syrian Economic Relations Development Committee, Commander Ghasemi helped establish the black-market channel for deliveries of Iranian crude oil to Syria's Banias Refinery Company ("BRC").  Commander Ghasemi was also the Iranian Minister of Transportation and Urban Development until approximately November 2022.  Commander Ghasemi vetted and approved the admission of co-conspirators into the scheme, approved crude oil sale and shipping agreements, approved oil tanker

purchase and charter agreements, resolved disputes that arose among the co-conspirators, and enforced compliance when disputes threaten to disrupt the sale of the IRGC's oil.

10.    BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," the defendant, is a publicly identified IRGC-QF official who has played a primary role in overseeing IRGC-QF's activities in Turkey. Among other things, SHAHRIYARI worked with Turkey-based ASB Group officials, including SITKI AYAN and KASIM OZTAS, the defendants, and with IRGC-QF agents, including MOHAMMAD SADEGH KARIMIAN, the defendant, to orchestrate transactions to launder NIOC crude oil and petroleum products using intermediary companies based in Turkey, Cyprus, Russia, and elsewhere and to launder the proceeds of these sales, including through bulk cash smuggling.

11.    MOHAMMAD SADEGH KARIMIAN, the defendant, is an Iranian national and acts as an agent of the IRGC-QF. KARIMIAN, who has been designated as an SDN under national security controls relating to global terrorism, plays a principal role in overseeing the creation and use of intermediary companies to act on behalf of the IRGC and in organizing and supervising deals for the sale and transportation of Iranian crude oil and petroleum products.

12.    MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," the defendant, an Iranian national, is a senior officer with Safiran Payam Darya Shipping Company ("SAPID"), which acts on behalf of the Government of Iran. ALIAKBARI, who has been designated as an SDN under national security controls relating to global terrorism, plays a principal role in organizing and supervising the procurement of tankers and the maritime transportation of NIOC's crude oil as part of the oil-laundering scheme. Many of the tankers

involved are ultimately owned or controlled by the National Iranian Tanker Company ("NITC") and the Islamic Republic of Iran Shipping Lines ("IRISL").

13.    MORTEZA ROSTAM GHASEMI, the defendant, an Iranian national and the son of Commander Ghasemi, plays a key role in supervising and directing the IRGC-orchestrated oil-laundering scheme.  MORTEZA ROSTAM GHASEMI has also been designated as an SDN under national security controls relating to global terrorism.  MORTEZA ROSTAM GHASEMI facilitates communications about the IRGC oil-laundering scheme among the co-conspirators and, prior to Commander Ghasemi's death, relayed instructions on behalf of Commander Ghasemi.

14.    SITKI AYAN, the defendant, is a Turkish national and businessman with a long history of partnering with Iranian state-owned oil and gas companies.  AYAN is the chairman of the above-described ASB Group of companies, which includes Som Petrol Ticaret A.S. ("Som Petrol"), Baslam Petrol Sanayi Ve Ticaret A.S. ("Baslam Petrol"), and Baslam Nakliyat Ve Dis Ticaret, Ltd. Sirketi ("Baslam Nakliyat").  At AYAN's direction and control, the ASB Group acts as an intermediary for the IRGC, NIOC, and NITC in international petroleum and oil tanker deals.  By concealing the Government of Iran's role in these deals, AYAN gives those entities access to international oil markets, tanker markets, and financial systems.  AYAN and his companies have caused U.S. banks and companies to conduct transactions totaling millions of dollars in furtherance of the scheme.

15.    BAHADDIN AYAN, the defendant, is a Turkish national and the son of SITKI AYAN, the defendant, is a vice president of the ASB Group of companies and is a participant in the IRGC oil-laundering scheme.  BAHADDIN AYAN has transferred millions of

dollars through U.S. banks in furtherance of the scheme to pay for shipping services for the laundered NIOC oil.

16.     KASIM OZTAS, the defendant, is a Turkish national who has been managing director of the ASB Group of companies.  OZTAS facilitated communications in furtherance of the IRGC oil-laundering scheme among co-conspirators and played a significant operational role in carrying out the black-market oil deals.  OZTAS sent and received documentation in furtherance of the scheme, including contracts and draft contracts, falsified transactional documents, and payment instructions.

## RELEVANT SANCTIONED ENTITIES AND INDIVIDUALS

### The IRGC and IRGC-QF

17.     The IRGC is an Iranian military and counterintelligence organization under the authority of the Supreme Leader of Iran.  The IRGC plays a key role in Iran's development of ballistic missiles and in Iran's support for international terrorism and foreign terrorist organizations, and exercises significant control and influence over the Iranian economy, especially in the oil and gas sector.  The IRGC was designated on or about October 25, 2007 by the U.S. Department of State as an SDN under Executive Order 13382, relating to the proliferation of weapons of mass destruction ("WMDs"), for its role in supporting the proliferation of ballistic missiles capable of carrying WMDs and procuring equipment that could be used to support the Government of Iran's ballistic missile and nuclear programs.

18.     The IRGC was further designated on or about October 13, 2017 by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224, relating to global terrorism, for its role in supporting the terrorist activities of the IRGC-QF.  The IRGC-QF was designated by

OFAC as an SDN under Executive Order 13224 on or about October 25, 2007, for its role as the Government of Iran's primary arm for executing the Government of Iran's policy of supporting terrorist and insurgent groups, including Hizballah, Hamas, and the Taliban, and insurgent forces in Iraq and Yemen, including Ansarallah, commonly referred to as the Houthis. On or about April 15, 2019, the U.S. Department of State designated the IRGC as an FTO under Section 219 of the Immigration and Nationality Act for the IRGC's direct involvement in terrorist plotting, support for terrorism, and hostage-taking.

### NIOC, NITC, IRISL, and SAPID

19.    NIOC is an Iranian state-owned petroleum company, owned and controlled by the Iranian Ministry of Petroleum. On or about September 24, 2012, OFAC identified NIOC as an agent or affiliate of the IRGC pursuant to Section 312 of the Iran Threat Reduction and Syria Human Rights Act of 2012. A number of NIOC officers have been individually designated as SDNs. On or about November 5, 2018, OFAC designated NIOC as an SDN under Executive Order 13599 and the Iranian Transactions and Sanctions Regulations ("ITSR"), and blocked any property in the United States, or in the possession or control of any U.S. person, of any person determined to have assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC or any entity owned or controlled by NIOC since November 5, 2018. NIOC was further designated as an SDN on or about October 26, 2020, under Executive Order 13224, relating to global terrorism.

20.    NITC is an Iranian state-owned tanker and transportation company, owned and controlled by NIOC. OFAC identified NITC as part of the Government of Iran in July 2012. NITC has been the subject of numerous OFAC designation actions and advisories for deceptive

shipping practices designed to evade sanctions. NITC was designated as an SDN by OFAC on or about October 26, 2020, under Executive Order 13224, relating to global terrorism.

21.    IRISL is an Iranian state-owned maritime transportation company. IRISL was designated as an SDN by OFAC on or about September 10, 2008, for providing logistical services to Iran's Ministry of Defense and Armed Forces Logistics. IRISL has been the subject of numerous OFAC designation actions and advisories for deceptive shipping practices designed to evade sanctions.

22.    SAPID is an Iranian state-owned shipping company. On or about June 16, 2010, OFAC designated SAPID as an SDN under Executive Order 13382 and identified SAPID as having been formed by IRISL to manage several ships previously directly owned by IRISL to handle IRISL's bulk and general cargo operations.

### SYTROL and BRC

23.    The Syrian Petroleum Marketing Department ("SYTROL") is the Syrian state-owned petroleum marketing company. On or about August 18, 2011, the President of the United States issued Executive Order 13582, which expanded upon previously declared national emergencies with respect to the Government of Syria's continuing escalation of violence against the people of Syria and, among other things, (i) blocked all property and interests in property of the Government of Syria in the United States or in the possession or control of any U.S. person; and (ii) prohibited the exportation, reexportation, sale, or supply, directly or indirectly, of any services from the United States or by a U.S. person to Syria. That same day, OFAC determined that SYTROL was a Government of Syria entity.

24.     BRC is a Syrian state-owned petroleum refining company.  On or about May 8, 2014, OFAC identified BRC as part of the Government of Syria pursuant to Executive Order 13582.

### Commander Ghasemi, SHAHRIYARI, MORTEZA ROSTAM GHASEMI, ALIAKBARI, and KARIMIAN

25.     On or about February 10, 2010, OFAC designated Commander Ghasemi as an SDN under Executive Order 13382.  OFAC stated that "IRGC General Rostam Qasemi [Ghasemi] . . . is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations.  Khatam al-Anbiya is owned or controlled by the IRGC and is involved in the construction of streets, highways, tunnels, water conveyance projects, agricultural restoration projects, and pipelines."  As set forth above, following Commander Ghasemi's August 2011 appointment as Iran's Minister of Petroleum, on or about September 24, 2012, OFAC found that NIOC, Iran's principal state-owned oil company under the supervision of the Petroleum Ministry, was an agent or affiliate of the IRGC.

26.     On or about June 23, 2011, OFAC designated BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," as an SDN pursuant to Executive Order 13224.  According to OFAC, SHAHRIYARI was acting on behalf of an IRGC-linked shipping company that provided material support, including weapons, to Hizballah on behalf of the IRGC.

27.     On or about September 4, 2019, OFAC designated Commander Ghasemi and MORTEZA ROSTAM GHASEMI, the defendant, as SDNs under Executive Order 13224.  OFAC stated that Commander Ghasemi "manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil.  Qasemi [Commander

Ghasemi] relies on trusted IRGC-QF officials and associates to run the network, including his son, Morteza Qasemi. Morteza Qasemi has helped finalize the network's oil contracts."

28. Also on or about September 4, 2019, OFAC designated MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," the defendant, as an SDN pursuant to Executive Order 13224. OFAC stated that "[SAPID] official Mohammadreza Ali Akbari (Akbari) [ALIAKBARI] serves as an interlocutor between the IRGC-QF and vessel managers . . . . Akbari also helped the IRGC-QF skirt sanctions in previous years."

29. On or about May 25, 2022, OFAC designated MOHAMMAD SADEGH KARIMIAN, the defendant, as an SDN pursuant to Executive Order 13224. OFAC stated that KARIMIAN "help[s] facilitate the illicit sale of Iranian oil for the IRGC-QF. [KARIMIAN has] travelled from Iran to Turkey and worked with [U.S.-designated IRGC-QF official Behnam Shahriyari's] network to conceal the source of the proceeds from these sales. Additionally, Karimian . . . arranged the sale and transport of tens of thousands of tons of oil on behalf of senior IRGC-QF officials Shahriyari and Ghasemi."

### SITKI AYAN, BAHADDIN AYAN, KASIM OZTAS, and ASB Group Companies

30. On or about December 8, 2022, OFAC designated SITKI AYAN, BAHADDIN AYAN, KASIM OZTAS, the defendants, and ASB Group companies ASB Group of Companies Limited, Baslam Nakliyat, Baslam Petrol, and Som Petrol, among others, as SDNs pursuant to Executive Order 13224. OFAC stated that "Sitki Ayan has used his extensive business network to both facilitate and conceal the sale and shipment of Iranian oil on behalf of the IRGC-QF and in partnership with senior IRGC-QF officials, including U.S.-designated IRGC-QF official Behnam Shahriyari and former IRGC-QF official Rostam Ghasemi. Ghasemi previously played a central role in facilitating shipments of oil and petroleum products for the financial benefit of the

IRGC-QF. Ayan has established business contracts to sell Iranian oil worth hundreds of millions of dollars to buyers in the People's Republic of China and elsewhere in East Asia, the United Arab Emirates, and Europe; helped arrange transportation of Iranian oil; and funneled the proceeds of oil sales back to the IRGC-QF."

31.    Also on or about December 8, 2022, OFAC designated several companies as SDNs pursuant to Executive Order 13224 for providing financial, material, or technological support for, or goods and services to or in support of, the IRGC-QF in connection with the sale and transportation of Iranian crude oil and petroleum products with ASB Group companies and other entities, including CGN Trade FZE ("CGN Trade"), OilGasConsulting-Victoria Holding Ltd. ("OGC Victoria"), and Rain Trade Gida Ic Ve Dis Ticaret Limited Sirketi ("Rain Trade").

32.    On or about November 29, 2023, OFAC designated several companies as SDNs pursuant to Executive Order 13224 for their involvement in financial facilitation networks for the benefit of the IRGC-QF and other Iranian military entities, including Solise Energy FZE ("Solise Energy").

## THE IRGC SANCTIONS-EVASION SCHEME

33.    As described more fully below, between at least approximately 2018 and up to and including the present, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and their co-conspirators, including Commander Ghasemi, engaged in a wide-ranging scheme to sell hundreds of millions of dollars' worth of NIOC crude petroleum and petrochemical products on behalf of, and under the control of, the IRGC to

international buyers, specifically, the Syrian Government and buyers in China and the Far East. This IRGC oil-laundering scheme has involved the use of a myriad of deceptive techniques, including (i) the use of front companies and intermediaries in countries outside of Iran to disguise the IRGC's role in the oil transactions and the Iranian source of the oil; (ii) the use of falsified documentation to misrepresent the source of the oil and deceive unwitting companies and banks and cause them to provide services in furtherance of the scheme; and (iii) the use of ship-to-ship transfers and the manipulation of location and shipping data for vessels used in furtherance of the scheme in order to obscure the loading and unloading of their Iranian oil cargoes and avoid the identification of the vessels used to facilitate the oil laundering.  In the course of the scheme, money and services were unlawfully exported from the United States and by U.S. persons to Iran for the benefit of the IRGC and NIOC, and millions of dollars in furtherance of the scheme were transferred through unwitting U.S. financial institutions.

34.    In one aspect of the scheme, as described below, members of the conspiracy worked with others, including the Government of Syria, a Lebanese oil brokering company, and an India-based shipping services company, to transport dozens of shipments of NIOC crude oil from Iran to Syria for delivery to the sanctioned BRC.

35.    In a second aspect of the scheme, members of the conspiracy worked with others, including an Omani company and a group of shipping services companies, to transport NIOC crude oil from Iran to buyers in China, using ship-to-ship transfers in an attempt to conceal the origin of the oil.

36.    In a third aspect of the scheme, members of the conspiracy worked with others, including companies located in Cyprus, the U.A.E., and Russia, to transport NIOC crude

oil from Iran to buyers in Russia, Uzbekistan, China, and elsewhere, using falsified documents and intermediary companies to conceal the origin of the oil and to launder the proceeds of the sales.

**The Co-Conspirators Ship**
**NIOC Crude Oil From Iran to Syria**

37.    From at least in or about 2018 through the present, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, together with their co-conspirators, including Commander Ghasemi, transported and caused the transportation of dozens of shipments of NIOC crude oil from Iran to Syria.

a.    On or about March 7, 2018, SYTROL entered into an agreement with a Lebanon-based company ("Lebanon Company-1") for Lebanon Company-1 to supply approximately 12 million barrels of crude oil to Baniyas, Syria, to be refined by BRC.  The agreement was signed by the President of SYTROL.

b.    On or about March 12, 2018, SYTROL requested the Syrian Central Bank to open a letter of credit in the amount of $73 million in favor of Lebanon Company-1 in connection with the March 7, 2018 agreement.

c.    On or about November 4, 2018, ALIAKBARI sent an email to the chief executive officer of Lebanon Company-1, a co-conspirator not named as a defendant herein ("CC-1"); and to another officer of that company, a co-conspirator not named as a defendant herein ("CC-2"), attaching a signed contract for SAPID to provide Lebanon Company-1 with tankers to transport Iranian crude oil from Kharg Island, Iran, to Baniyas, Syria.  The contract included a

rider providing, among other things, that "This contract is endorsed by Mr.ROSTAM GHASEMI," referring to Commander Ghasemi.[2]

d.       On or about December 27, 2018, a principal of an India- and Dubai-based group of shipping services companies ("India Group-1"), a co-conspirator not named as a defendant herein ("CC-3"), sent CC-2 an email, copied to ALIAKBARI, describing a meeting held on Kish Island, Iran, to discuss India Group-1 chartering (that is, renting) tankers for Lebanon Company-1, and India Group-1 providing ship management services for Lebanon Company-1.

e.       On or about January 24, 2019, CC-3 sent an email to CC-2, copied to ALIAKBARI and others, discussing India Group-1's inspecting tankers for use by Lebanon Company-1 and attaching documents relating to another candidate tanker, and discussing India Group-1 managing two tankers named the "*Kamila*" and the "*Grace 1*" for Lebanon Company-1.

f.       On or about January 28, 2019, CC-2 sent an email to CC-3, copied to ALIAKBARI and others, responding to the January 24, 2019 email and advising that CC-2 had checked the files sent by CC-3 "with mr ghasemi and he said its ok," referring to Commander Ghasemi.

g.       On or about January 30, 2019, CC-2 forwarded to ALIAKBARI an email CC-2 had received from CC-3, attaching proposed ship management agreements and budgets for India Group-1 to manage two tankers, the *Grace 1* and the "*Bonita Queen*" (as the *Kamila* had been renamed).

h.       On or about January 31, 2019, CC-3 sent an email to CC-2, copied to ALIAKBARI and others, discussing a telephone conversation between CC-3 and ALIAKBARI

---

[2] The statements described in this Indictment are reported in substance and in part. Typographical and other errors in quotations are reproduced as they appear in the original communications, unless otherwise indicated.

in which ALIAKBARI informed CC-3 that the proposed ship management budgets, described above, had been accepted and that "Mr. Ghasemi," referring to Commander Ghasemi, "wants us to come and discuss with him for smooth delivery of both vessels ( Grace 1 & Kamila)."

        i.      Also on or about January 31, 2019, CC-2 sent an email to CC-3, copied to ALIAKBARI and others, advising that Commander Ghasemi wanted the contracts signed in Tehran: "[F]or the managment contracts Mr Ghasemi's opinion is that u come to tehran in the nearest chance [to settle] it down and sign [the contracts]."

        j.      On or about March 9, 2019, ALIAKBARI sent an email to CC-2 attaching a draft letter addressed to the Secretary of the Iranian Supreme National Security Council—Iran's national security policy-making body, which makes recommendations to the Supreme Leader and whose membership is comprised of Iranian Government ministers, military leaders, and other officials. The letter, in Farsi, described how companies belonging to the "axis of resistance"—a phrase commonly used to describe an anti-Western alliance among Iran, the Assad regime in Syria, Hizballah, Hamas, and others—had purchased oil tankers to transport crude oil, but the names of these ships had been placed on sanctions lists and countries were refusing to register them. The draft letter asked, in light of the importance of the issue and based on orders of senior Iranian military officials, for assistance in re-registering the ships in Iran in order to continue aiding Syria.

        k.      On or about March 12, 2019, a representative of India Group-1 sent an email to CC-2, copied to ALIAKBARI and others, discussing repairs and reprovisioning of the *Grace 1* required for the tanker to set sail and load crude oil.

        l.      On or about April 10, 2019, CC-2 sent an email to several NIOC representatives with insurance records for the *Grace 1*, and on or about April 11, 2019, CC-2

received an email from one of the NIOC representatives advising that the *Grace 1* was cleared to load Iranian light crude oil from Kharg Island, Iran.

   m. On or about June 17, 2019, a representative of India Group-1 sent an email to the captains of the *Grace 1* and the *Bonita Queen*, copied to ALIAKBARI, instructing the captains to include an email account used by ALIAKBARI on all communications with India Group-1.

   n. On or about June 20, 2019, ALIAKBARI, using an account created by India Group-1 for his use, sent an email to a representative of an India Group-1 company and to CC-2. The email approved the purchase of spare parts and services for the *Grace 1* when the tanker made an intended stop at Gibraltar on its journey to Syria.

   o. On or about July 4, 2019, the *Grace 1* was detained by the British Royal Marines and the Royal Gibraltar Police off the coast of Gibraltar. On that same date, a spokesperson for Mohammad Javad Zarif, then-Foreign Minister of Iran, publicly stated that the United Kingdom's ambassador to Iran had been summoned over the detention. On or about July 5, 2019, Moshen Rezaei, then an IRGC Commander and Secretary of the Iranian Expediency Council—a governmental body that resolves disputes between the Iranian parliament and the Guardian Council, and whose members are appointed by the Supreme Leader—published a statement on social media that "[i]f Britain does not release the Iranian oil tanker, it is the authorities duty to seize a British oil tanker." On or about July 16, 2019, Ali Khamenei, Supreme Leader of Iran, publicly stated that the United Kingdom had committed piracy by detaining the *Grace 1* and that Iran would not leave such evil deed unanswered.

   p. On or about July 19, 2019, a co-conspirator not named as a defendant herein ("CC-4"), a representative of NITC, sent an email to CC-3 and others with a news

article about a Gibraltar court's decision to extend the detention for 30 days and attaching two photographs of the *Grace 1*.

        q.      On or about July 19, 2019, Iranian military forces detained a British-flagged cargo ship transiting the Persian Gulf.

        r.      On or about July 28, 2019, a representative of India Group-1 sent an email to another representative of India Group-1 attaching documents reflecting that, on or about July 26, 2019, the ship formerly known as *Grace 1* had been re-registered with Iranian authorities as the "*Adrian Darya 1*."

        s.      On or about August 18, 2019, after the crew of the *Grace 1* had been replaced and the tanker was renamed the *Adrian Darya 1*, ALIAKBARI sent an email to the master of the *Adrian Darya 1* instructing the master to proceed to Kalamata, Greece, and that "[t]he vessel must depart from Gibraltar in any condition by tonight to avoid unwanted."

        t.      On or about August 20, 2019, after the *Adrian Darya 1* departed Gibraltar, ALIAKBARI sent an email to the master of the tanker to change course from Greece to Turkey, and to keep the maximum possible distance between the tanker and the coastlines of European Union countries. ALIAKBARI instructed, however, that the tanker should advertise its destination as either Greece or any safe Mediterranean port. The master was instructed to keep ALIAKBARI's instructions secret from the crew.

        u.      On or about August 29, 2019, ALIAKBARI sent an email to the master of the *Adrian Darya 1* instructing the vessel to change course for Tartus, Syria, and to turn off all navigation aids and to keep the instruction secret from the tanker's staff until the vessel had arrived and dropped anchor.

v.      On or about August 31, 2019, ALIAKBARI sent the master of the *Adrian Darya 1* messages instructing that the vessel could proceed towards Beirut, Lebanon, in order to change out the crew, but that if the master proceeded to Tartus, Syria, the owner of the *Adrian Darya 1* would pay a large bonus.

w.      On or about September 1, 2019, ALIAKBARI sent the master of the *Adrian Darya 1* messages encouraging the master to take the vessel near Tartus, Syria, to offload the Iranian crude oil by ship-to-ship transfer. ALIAKBARI wrote: "It is not business[,] we do it for our people[.] We are under sanction[,]" and "I pay USD 500,000."

x.      On or about September 3, 2019, ALIAKBARI sent messages to the master of the *Adrian Darya 1* and to CC-2 about the *Adrian Darya 1*'s meeting with another tanker named the "*Jasmine*" in order for the *Jasmine* to offload the *Adrian Darya 1*'s crude oil cargo by ship-to-ship transfer and to change crew members aboard the *Adrian Darya 1*. Following this, the *Jasmine* travelled to Tartus, Syria.

y.      Since at least 2019, in addition to the delivery described above, Commander Ghasemi, ALIAKBARI, CC-2, CC-3, Lebanon Company-1, India Group-1, and others have worked together to cause the delivery of Iranian oil to Syria using tankers called the *Masal*, the *Marshal Z* (later renamed the "*Romina*"), the *Tour 2* (later renamed the "*Delbin*"), the *Sobar*, the *Solan*, the *Sarak*, and the *Savior*, among others.

z.      Between at least approximately December 2018 and the date of this Indictment, India Group-1 caused wire transfers for payment of crew salaries, crew management fees, and canal transit fees for tankers carrying Iranian crude oil, including the *Adrian Darya 1* (later again renamed the "*Arman 114*"), the *Bonita Queen* (later renamed the "*Safoora*," the "*Sahra*," the "*Traden*," and the "*Sirvan Sabou*"), the *Masal*, the *Romina*, the *Delbin*, the *Sobar*,

the *Solan*, the *Sarak*, and the *Savior*, which were processed through correspondent bank accounts held at U.S. banks and located in Manhattan, New York.

### The Co-Conspirators Ship
### NIOC Crude Oil From Iran to the Far East

38.     From at least in or about 2019 through the present, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, together with their co-conspirators, including Commander Ghasemi, transported and caused the transportation of NIOC crude oil from Iran to buyers in the Far East.

a.      On or about May 22, 2019, OZTAS sent himself an email attaching a scanned copy of a contract between Som Petrol—an ASB Group company having SITKI AYAN as its chairman—and China Oil and Petroleum Company ("China Oil and Petroleum"), a company purportedly having a Hong Kong address, for Som Petrol to supply China Oil and Petroleum with 20 million barrels of light and heavy crude oil, to be delivered by maritime shipment. An associate of Commander Ghasemi signed the contract on behalf of China Oil and Petroleum and KARIMIAN signed as a witness. The contract included a side letter, written in both English and Farsi, memorializing the parties' agreement to conceal the Iranian origin of the crude oil by misrepresenting it as being of Iraqi origin: "Both parties do hereby agree that the commodity subject matter is IRANIAN light & heavy crude oil, but seller commits to provide full set of Somo documentation for the cargo." "Somo" refers to the State Organization for Marketing of Oil, an Iraqi national oil company. The side letter further provided that "[a]ny dispute arising our of or in connection with this Agreement" would be resolved by KARIMIAN.

21

b.      On or about November 25, 2019, a representative of China Oil and Petroleum sent an email to a representative of a company based in Switzerland ("Swiss Company-1"), copied to OZTAS, that described a meeting held in Warsaw, Poland to discuss a business arrangement, whereby Swiss Company-1 would provide a bank guarantee to facilitate the sale of crude oil by "X group" to buyers in China.

c.      On or about December 5, 2019, OZTAS received an email referring to an upcoming meeting in Istanbul, Turkey, to finalize a contract and describing the "delegations" that would attend that meeting, including Swiss Company-1; the "US guests"; a Middle Eastern company whose "contract should be Cargo on Board of the vessel FOB Oman," meaning the seller would place the cargo on a tanker in Oman for delivery to the buyer, "as agreed and noticed to roger"; and a representative of a Chinese-named company who "met roger this week on Monday." The references to "Roger" were to Commander Ghasemi.

d.      On or about February 7, 2020, OZTAS sent an email to SITKI AYAN, copying BAHADDIN AYAN and another representative of ASB Group, with the subject (in Turkish) "Tanker project" and attaching a document, also in Turkish, analyzing the purchase and use of oil tankers to transport oil from Oman to Malaysia for "floating storage," where the oil would be further transferred by ship-to-ship transfer for transport to China to deliver the cargo to port.

e.      On or about April 13, 2020, OZTAS sent an email to another representative of ASB Group containing the text of a message that OZTAS appears to have received from another individual. The message sought ASB Group's help for the author's company, which was based in Iran, to make payments in U.S. dollars and Euros outside Iran.

**The *Escapade***

   f.  In approximately early February 2020, a tanker called the "*Escapade*" loaded Iranian crude oil from Kharg Island, Iran.  At the time, the *Escapade*'s automatic identification system ("AIS"), a transceiver-based vessel-identification system, was not broadcasting.

     i.  The International Convention for the Safety of Life at Sea ("SOLAS"), a maritime treaty, requires vessels of greater than 300 gross tons engaged on international voyages to carry an AIS capable of providing information about the ship to other ships and to coastal authorities automatically.  According to the website of the International Maritime Organization, SOLAS is "generally regarded as the most important of all international treaties concerning the safety of merchant ships."  That regulation requires that a ship's AIS be able to transmit the ship's identity, type, position, course, speed, navigational status, and other safety-related information automatically to appropriately equipped shore stations, other ships, and aircraft, as well as to receive automatically such information from similarly fitted ships.

     ii.  AIS signals are transmitted openly through radio signals, and are made available both through publicly available databases and to government agencies with responsibility for such matters.

     iii.  Continuous operation of AIS is a critical factor for safe ship operating, particularly for avoiding collisions with other vessels.  Accordingly, the fact that a vessel has turned off its AIS transmissions can be evidence of an attempt to avoid detection of the vessel's location, course, speed, or other navigational status.

   g.  On or about May 29, 2020, OZTAS received an email from a representative of China Oil and Petroleum, asking OZTAS to issue an invoice to a U.S. person for

approximately 740,000 barrels of purportedly Omani blend crude oil, which was on board the *Escapade*, and to include ASB Group's bank account information.  The message stated that the buyer had leased tanks in Qingdao, China, to receive the oil, that the buyer would wire the invoice value after delivery, and that the buyer had already transferred to "Roger," meaning Commander Ghasemi, $5 million to cover shipping costs.

          h.      On or about June 18, 2020, OZTAS received an email from an individual, a co-conspirator not named as a defendant herein ("CC-5"), stating that: "Concerning the escapade, my chinese buyer is ready to finish the deal."

          i.      On or about July 6, 2020, OZTAS sent himself an email attaching a draft "Authority to Sell" that would authorize a U.S. company to sell the crude oil on board the tanker *Escapade*.  The document purported that the cargo was Omani light crude oil, when in fact it was Iranian crude oil.

          j.      On or about July 20, 2020, OZTAS received an email from CC-5, offering to procure a buyer who was interested in purchasing "cargoes which are stuck in the Chinese sea."  CC-5 noted that he had been in touch with another individual who offered to put CC-5 in contact with the owner of one such cargo, but that CC-5 "trust[ed] only Mr. Ayan in this business," referring to SITKI AYAN.  CC-5 wrote that he hoped not to lose an opportunity with the prospective buyer, as an earlier opportunity with respect to the *Escapade* had been lost.

          k.      Also on or about November 5, 2020, SHARHRIYARI emailed an electronic copy of a document reporting on the status of a shipment of approximately 731,000 barrels of crude oil to China, referring to the shipment of Iranian crude oil on board the *Escapade*, detailing various disputes and obstacles involved in the delivery of the cargo to China.  The document noted that a statement of expenses relating to the vessel had been provided.  On or about

the same day, SHAHRIYARI emailed a copy of an electronic document reflecting a statement of expenses relating to approximately 731,000 barrels of crude oil loaded on the *Escapade*, totaling approximately $15.6 million in U.S. dollars. The expenses included the "Re-documentation Original Verifiable Chamber CoO," referring to the expense of re-documenting the Iranian crude oil as purportedly Omani-origin crude oil.

### The *Oman Pride*

l.      In or about April and May 2020, an owner of a shipping company ("Shipping Company-1") entered agreements with the owner of a company formed in Oman ("Omani Company-1"), about the purchase and management of the *Oman Pride*. A company having an address in Liberia, a co-conspirator not named as a defendant herein ("Ship Owner-1"), was formed to hold title to the *Oman Pride*.

m.      The *Oman Pride* was used repeatedly to ferry NIOC crude oil from Iranian loading ports and waters to the Gulf of Oman for ship-to-ship transfer to other tankers, for transport to buyers in China. Some of the tankers involved in these ship-to-ship transfers include the *Niovi*, the *Carmen*, and the *Athina II*. As described below, financial disputes arose among the parties, requiring the intervention of Commander Ghasemi to settle disagreements or to enforce compliance in furtherance of the oil-laundering scheme.

### The *Niovi*

n.      On or about July 7, 2020, OZTAS sent himself an email attaching an image file of an electronic chat in Chinese characters. The body of the email contained a draft English translation of a portion of the electronic chat, which stated that: "This said the crude origin is Iran. The title own by Iran national oil company. The Oman company which is [Omani Company-1] is the seller for this ship."

o.     In or about mid-July 2020, the *Oman Pride* loaded Iranian crude oil at Sirri Island, Iran. At the time, the *Oman Pride* was falsely transmitting the AIS signal of a decommissioned vessel, while another vessel located outside the Persian Gulf falsely transmitted the AIS signal of the *Oman Pride*.

p.     In or about late July 2020, the *Oman Pride* offloaded Iranian crude oil by ship-to-ship transfer to a tanker called the "*Niovi*."

q.     In or about mid-November, 2020, the *Niovi* discharged the oil in the vicinity of Yantai, China.

r.     On or about November 17, 2020, SHAHRIYARI and ALIAKBARI exchanged an electronic copy of a freight invoice issued to Omani Company-1 for the *Niovi* in the net amount of $41,243.61. The invoice provided that the correspondent bank for payment to the issuer was a U.S. bank located in New York.

s.     On or about November 29, 2020, SHAHRIYARI and ALIAKBARI exchanged an electronic copy of a draft letter from Omani Company-1 to two China-based companies regarding the discharge of crude oil from the *Niovi*. The draft letter represented that title to the crude oil had been transferred to Baslam Nakliyat.

### The *Carmen*

t.     On or about August 1, 2020, SITKI AYAN signed a "Recap" agreement with Ship Owner-1 on behalf of Baslam Petrol. The August 1, 2020 Recap agreement provided that Baslam Petrol would charter the *Oman Pride* from Ship Owner-1 to transport at least approximately two million barrels of light crude oil, purportedly to be loaded in Iraq, to a south China port.

u.      In or about August 2020, the *Oman Pride* loaded Iranian crude oil from Iran. During this time, the *Oman Pride* was falsely transmitting the AIS signal of a decommissioned vessel, while another vessel located outside the Persian Gulf falsely transmitted the AIS signal of the *Oman Pride*.

v.      In or about mid-September, 2020, the Oman Pride offloaded Iranian crude oil by ship-to-ship transfer to a tanker called the "*Carmen*."

w.      On or about September 14, 2020, Commander Ghasemi, SHAHRIYARI, KARIMIAN, ALIAKBARI, the owner of Shipping Company-1, and others met in Istanbul, Turkey.

x.      On or about September 14, 2020, Baslam Petrol entered into an agreement with Ship Owner-1 and Shipping Company-1 concerning the sale of crude oil. As set forth in the agreement, Baslam Petrol and Shipping Company-1 agreed to the transfer of crude oil from the *Oman Pride* to the *Carmen*, further agreed that Baslam Petrol was the ultimate owner of the cargo, acknowledged that Baslam Petrol owed $1 million to Shipping Company-1, and agreed that Shipping Company-1 would assume Ship Owner-1's obligations under the August 1, 2020 agreement described above, *supra* ¶ 38(t).

y.      On or about September 30, 2020, Ship Owner-1 caused a wire transfer of approximately $248,447.09 from its account in Germany to an account in the name of another company located in Hong Kong, China. The message from the originator to the beneficiary stated: "MT OMAN PRIDE REF. INC00003749 PAYMENT OF BUNKERS." The wire transfer was processed through correspondent bank accounts held at two U.S. banks located in Manhattan, New York.

z.      On or about October 9, 2020, Baslam Nakliyat—another ASB Group company—agreed to sell the crude oil on board the *Carmen* to a petrochemical company located in China ("PRC Company-1").

aa.     On or about October 29, 2020, a representative of Shipping Company-1 sent a letter addressed to a logistics company located in China that represented that Shipping Company-1 had loaded "Oman light crude oil from Sohar, Oman" on the *Carmen* and that prior assignments of the cargo were cancelled and invalid. Shipping Company-1 purported to consign the cargo to PRC Company-1.

bb.     On or about October 30, 2020, MORTEZA ROSTAM GHASEMI sent an electronic message to the owner of Shipping Company-1 asking for the owner of Shipping Company-1's help "to finish Carmen discharge" and claiming that the situation was having a negative impact on Commander Ghasemi's health. MORTEZA ROSTAM GHASEMI further wrote "I want to mention and ask you in the presence of god & Allah and Mohammad and Christ to help my dad [Commander Ghasemi] on CARMEN and I SWEAR I will help you on the subjects better than that."

cc.     On or about November 5, 2020, SHAHRIYARI emailed electronic copies of documents relating to the sale of approximately 1.9 million barrels of purportedly Omani crude oil by Omani Company-1 in approximately September 2019 to a company having an address in China for a total price of approximately $121.8 million dollars.

dd.     Also on or about November 5, 2020, SHAHRIYARI emailed an electronic copy of a document containing terms relating to the chartering of the *Oman Pride* for a period of 1 year at a rate of approximately $54,000 per day.

ee.    On or about November 15, 2020, Commander Ghasemi, KARIMIAN, MORTEZA ROSTAM GHASEMI, and ALIAKBARI were in Istanbul, Turkey.

ff.    On or about November 19, 2020, MORTEZA ROSTAM GHASEMI received an electronic copy of a "Statement of Account" for "CP 01.08.2020 – MT CARMEN"—a reference to the August 1, 2020 Recap agreement, *supra* ¶ 38(t). The Statement of Account reflects expenses and payments, denominated in U.S. dollars, relating to the *Carmen*'s loading and transport of crude oil from the *Oman Pride*. The ledger reflects payments from Baslam Petrol between August 14 and October 27, 2020, totaling approximately $10,072,480.

gg.    On or about November 19, 2020, the owner of Omani Company-1 signed a letter addressed to Baslam Nakliyat on behalf of Omani Company-1, pursuant to which Omani Company-1 transferred all of its interests in the crude oil on board the *Carmen* to Baslam Nakliyat.

hh.    On or about November 19, 2020, OZTAS emailed himself a draft memorandum of understanding between Commander Ghasemi and SITKI AYAN for SITKI AYAN to use ASB Group companies Baslam Petrol and Baslam Nakliyat to arrange for tankers to transport crude oil from the Middle East to China.

ii.    On or about November 26, 2020, a representative of Omani Company-1 sent an email to SHAHRIYARI, forwarding a notice of readiness for the *Carmen* to berth and discharge crude oil at the port in Rizhao, China.

jj.    On or about December 13, 2020, OZTAS sent himself an email attaching an electronic copy of a Sale and Purchase Agreement dated December 4, 2020, between PRC Company-1 and a company based in Hong Kong, China ("PRC Company-2"). Pursuant to

the agreement, PRC Company-1 purchased approximately 1,940,317 barrels of crude oil, described as Oman origin, located at Rizhao Port, China, from PRC Company-2.

        kk.     On or about December 4, 2020, Baslam Petrol and Shipping Company-1 entered a settlement agreement resolving disputes that had arisen under the August 1, 2020 agreement, *supra* ¶ 38(t); pursuant to which settlement agreement the two companies agreed to release their claims against each other, and to discharge the crude oil on board the *Carmen*—which was of Iranian origin—at a port in China.

        ll.     On or about December 9, 2020, the master of the *Carmen* confirmed the vessel's readiness to berth and discharge at a port in China.

        mm.     On or about March 31, 2021, OZTAS sent himself an email attaching a copy of an agreement between PRC Company-1, PRC Company-2, and a third company with an identified address in the Marshall Islands (the "Payment Company"), dated December 18, 2020, pursuant to which the parties agreed to make payment for the crude oil on board the *Carmen* at a port in China. PRC Company-2 agreed to pay $17 million to an account held by the Payment Company in Germany, with the correspondent bank for the transaction identified as a U.S. financial institution in New York.

        nn.     On or about December 13, 2021, OZTAS sent himself an email attaching an electronic copy of a letter on PRC Company-1 letterhead dated February 3, 2021 and addressed to SITKI AYAN advising, in Turkish, that PRC Company-1 wished to transfer its rights under the October 2020 contract with Baslam Petrol to PRC Company-2.

### The *Athina II*

        oo.     On or about October 1, 2020, SITKI AYAN signed a "Recap" agreement with Ship Owner-1 on behalf of Baslam Petrol. The October 1, 2020 Recap agreement

provided that Baslam Petrol would charter the *Oman Pride* from Ship Owner-1 to transport light crude oil from the Persian Gulf to south China ports.  On or about October 4, 2020, ALIAKBARI received a copy of that Recap agreement.

        pp.      In or about October 2020, the *Oman Pride* loaded Iranian crude oil from Iran.  During this time, the *Oman Pride* did not broadcast its AIS signal and another vessel located outside the Persian Gulf falsely transmitted the AIS signal of the *Oman Pride*.

        qq.      In or about early November, 2020, the *Oman Pride* offloaded Iranian crude oil by ship-to-ship transfer to a tanker called the "*Athina II*."

        rr.      Later in or about November 2020, while still alongside the *Oman Pride*, the *Athina II* reported a draft decrease—that is, a decrease in the depth of the vessel beneath the waterline.  A decrease in draft level would indicate that the tanker grew lighter, such as by discharging cargo.  Draft changes are manually reported by the vessel and are not measured automatically.  During this time, the *Oman Pride* did not report a draft change.

        ss.      On or about November 19, 2020, OZTAS sent an email addressed to "the owners of MT [Motor Tanker] ATHINA II" (as noted above, in or about early November, 2020, the *Oman Pride* offloaded Iranian crude oil by ship-to-ship transfer to the *Athina II*).  The email stated, in part:

> As Charterers of MT OMAN PRIDE, we have found out that our cargo loaded on MT OMAN PRIDE in quantity of 2,039,349 US BBLs [barrels] has been transferred STS [ship-to-ship] to your vessel MT ATHINA II without our permission or instruction.
>
> Therefore we would like to inquire if you have any information of this transfer and whether you have been informed that this has been done without the permission or information of our company.

MORTEZA ROSTAM GHASEMI was also sent a copy of the message.

tt.     On or about November 19, 2020, MORTEZA ROSTAM GHASEMI received an electronic copy of a "Statement of Account" for "CP 01.10.2020 – MT OMAN PRIDE"—a reference to the October 1, 2020 Recap agreement, *supra* ¶ 38(nn).  The Statement of Account reflected expenses and payments, denominated in U.S. dollars, relating to the *Oman Pride*'s transport and discharge of crude oil.  The ledger reflects payments from Baslam Petrol on October 9 and November 13, 2020, totaling approximately $16,801,265.

uu.     On or about November 20, 2020, MORTEZA ROSTAM GHASEMI received a screenshot of a message with the text of an email from OZTAS addressed to the owners of the *Athina II* stating, in part:

> We have been informed by Omani authorities that you received a laycan [the loading window for a cargo ship] for MT Athina II (IMO 9291286) and you are trying to leave the port of Sohar [Oman].
>
> Referring to my email yesterday, we are still waiting for you to provide us relevant documents and information about the STS transfer from the MT Oman Pride to MT Athina II, as well as the current status and volume of our cargo currently loaded illegally on your vessel.

The sender of the message stated: "so...this is the 2nd email," and asked, "Stelio, is [Omani Company-1] still in existence?"  These messages relate to a dispute between Commander Ghasemi, AYAN, OZTAS, and the ASB Group of companies, on the one hand, and Shipping Company-1, on the other hand, about the transport and disposition of the Iranian crude oil the *Athina II* had received from the *Oman Pride* and the payments that were due between the parties.

vv.     On or about November 22, 2020, Commander Ghasemi sent an email to the operator of the *Athina II*, referring to the dispute described above, and claiming the IRGC-QF's oil had been loaded on the *Athina II* without permission.  Commander Ghasemi made clear that he was writing on behalf of "Qods Force of IRGC from Iran" and referred to efforts to

help the IRGC to "by pass sanctions," including by bringing the *Athina II* into the scheme. Commander Ghasemi claimed that "our cargo" had been put "on board of your vessel ATHINA in Sohar," Oman. Commander Ghasemi claimed that the IRGC-QF was not "dropping any wall"—that is, excluding the owner from the oil-laundering scheme—but that the recipient "should cooperate with us in china case right now." If not, "this is the last chance not to make trouble." Commander Ghasemi went on: "Its not a threat its just reminder." Commander Ghasemi signed the email: "Commandor Rostam Ghasemi[,] IRGC Qods Force Deputy."

      ww.    In or about late November, 2020, the *Athina II* sailed away from the *Oman Pride*.

**The Co-Conspirators Ship**
**<u>NIOC Crude Oil from Iran to Russia, Uzbekistan, the Far East</u>**

      39.    From at least in or about 2020, up to and including the present, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, together with their co-conspirators, including Commander Ghasemi, transported and caused the transportation of NIOC crude oil and petroleum products from Iran to buyers in Russia, Uzbekistan, the Far East, and elsewhere.

      a.    Beginning in approximately 2020, SHAHRIYARI, KARIMIAN, SITKI AYAN, and others orchestrated the sale of Iranian crude oil, using the Cypriot company OGC Victoria as an intermediary, and laundering the proceeds through the Russian company RPP

33

LLC ("RPP") using the IRGC-QF oil sale proceeds for the purchase of agricultural products.[3] For example:

       i.     On or about April 16, 2020, KARIMIAN received an electronic copy of a draft contract between OGC Victoria, with an address in Cyprus, and Baslam Nakliyat. The contract provided for Baslam Nakliyat to sell OGC Victoria up to approximately 36 million barrels of Soroosh Crude Oil, meaning Iranian crude oil from the Iranian Soroosh Oil Field, to be delivered at the Soroosh Oil Terminal in Iran. The price for the crude oil was described as a price based on an average of published crude oil prices (known as Platts Dated Brent) with a discount of $18.50 per barrel.

       ii.    On or about April 20, 2020, KARIMIAN responded to the draft contract between OGC Victoria and Baslam Nakliyat, advising, among other things, that "price is bwave according to the seller contract with NIOC," a reference to the price being measured by the Brent weighted average (bwave).

       iii.   On or about April 22, 2020, KARIMIAN received another electronic copy of the draft contract between OGC Victoria and Baslam Nakliyat. This version of the contract provided that the quantity of oil was 12 million barrels with an initial trial cargo of 1 million barrels. On or about the same day, KARIMIAN replied, attaching a copy of the contract bearing a signature for Baslam Nakliyat.

       iv.   On or about April 24, 2020, KARIMIAN received a revised draft of the contract between OGC Victoria and Baslam Nakliyat describing the commodity only as "crude oil," without referring to the Soroosh Oil Field. This version of the contract also provided

---

[3] On or about May 25, 2022, OFAC designated RPP as an SDN pursuant to Executive Order 13224, stating that "[a]s early as April 2021, former IRGC-QF official Rostam Ghasemi leveraged Russia-based [RPP] . . . to transfer millions of dollars on behalf of the IRGC-QF from Russia."

that the oil would be delivered at an oil terminal as advised by the seller, without identifying the Soroosh Oil Terminal. Also on or about April 24, 2020, KARIMIAN received a draft of a side letter identifying the subject of the contract as Soroosh Crude Oil and the delivery port as Soroosh Terminal, Iran. The Iranian origin of the crude oil were separated into a side letter in order to assist the parties in concealing the Iranian origin.

v.     On or about May 11, 2020, KARIMIAN received an electronic copy of a revised draft of the contract between OGC Victoria and Baslam Nakliyat bearing a signature on behalf of OGC Victoria. This version of the contract provided for a quantity of 12 million barrels of crude oil with an initial trial cargo of 700,000 barrels. On or about May 15, 2020, KARIMIAN responded, attaching a copy of the contract bearing a signature on behalf of Baslam Nakliyat (the "Baslam Nakliyat-OGC Victoria Supply Contract").

vi.     On or about July 8, 2020, KARIMIAN and SHAHRIYARI exchanged an electronic copy of an addendum to the Baslam Nakliyat-OGC Victoria Supply Contract. The addendum provided, among other things, that the buyer (OGC Victoria) would make payment to RPP, having an address in Russia.

vii.     On or about July 9, 2020, KARIMIAN received an electronic copy of an Ullage report, or measurement of the quantity of cargo loaded, for the *Perun*, an oil tanker. According to the report, the *Perun* was carrying approximately 98,643 metric tons of Soroosh Crude Oil as measured near Kharg Island, Iran, on July 9, 2020.

viii.     On or about July 27, 2020, KARIMIAN received an electronic copy of a letter on OGC Victoria letterhead, dated July 23, 2020 and addressed to SITKI AYAN, Director of Baslam Nakliyat, and requesting Baslam Nakliyat to conduct a Soroosh oil

sampling operation at the Iranian Khalij e Fars floating storage unit, an offshore oil terminal servicing the Soroosh Oil Field.

        ix.    On or about August 21, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic copy of the Baslam Nakliyat-OGC Victoria Supply Contract, signed on behalf of OGC Victoria.

        x.    On or about August 24, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic copy of a contract between Baslam Nakliyat and RPP, bearing a signature on behalf of RPP, for RPP to sell to Baslam Nakliyat various agricultural products, such as sunflower seed oil, feed corn, and feed barley; as well as petroleum products such as liquified petroleum gas, diesel fuel oil, and gasoline.

        xi.    On or about August 25, 2020, KARIMIAN sent SHAHRIYARI a voice note asking SHAHRIYARI to have two contracts signed.

        xii.    On or about August 25, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic copy of a letter from Baslam Nakliyat to OGC Victoria, dated on or about August 13, 2020 and signed by SITKI AYAN, which instructed OGC Victoria to make payments under the Baslam Nakliyat-OGC Victoria Supply Contract to RPP.

        xiii.    On or about August 28, 2020, KARIMIAN sent SHAHRIYARI a voice note advising SHAHRIYARI that the contract with RPP was needed so that "we" could do transfers.

        xiv.    On or about August 28, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic copy of a draft letter from Baslam Nakliyat addressed to RPP advising that payment from Baslam Nakliyat to RPP for sunflower seed oil would be made by OGC Victoria.

xv.    On or about September 10, 2020, KARIMIAN sent SHAHRIYARI a voice note advising SHAHRIYARI that if a particular contract were signed, KARIMIAN would take all the previous contracts to Tehran and that "our friends" would also come to Tehran to take the originals to the bank.

xvi.    On or about September 11, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic copy of a subcontract between Baslam Nakliyat and RPP pursuant to the contract between Baslam Nakliyat and RPP, *supra* ¶ 39(a)(x). The subcontract was for the sale of sunflower seed oil by RPP to Baslam Nakliyat, and was signed by SITKI AYAN for Baslam Nakliyat.

xvii.    On or about October 18, 2020, KARIMIAN received a copy of an application for a flight entry and exit visa for a private plane to carry passengers from Moscow, Russia, to Tehran, Iran, arriving on or about October 20, 2020, and departing on or about October 21, 2020, for the purpose of negotiations with NIOC, the Iranian State Livestock Affairs Logistics, the Government Trading Corporation ("GTC"), an Iranian state agency, and the Iranian Port & Shipping Organization. The passengers included a co-conspirator not named as a defendant herein ("CC-6").

xviii.    On or about January 3, 2021, Commander Ghasemi issued a letter, on IRGC letterhead, addressed to RPP instructing RPP to buy sunflower seed oil, at the request of GTC, using the proceeds of the Baslam Nakliyat-OGC Victoria Supply Contract, *supra* ¶ 39(a)(v), (vi).

xix.    Also on or about January 3, 2021, Commander Ghasemi issued a letter, on IRGC letterhead, addressed to RPP instructing RPP to pay $5 million in U.S.

dollars to the Iranian Embassy in Moscow, Russia, from the proceeds of the Baslam Nakliyat-OGC Victoria Supply Contract, *supra* ¶ 39(a)(v), (vi).

xx.    On or about February 3, 2021, Commander Ghasemi issued a letter on IRGC letterhead addressed to a Russian state enterprise operated by the Russian Ministry of Energy, giving notice that NIOC had assigned that state enterprise's debt of approximately $53.6 million to RPP.

xxi.    On or about March 31, 2021, Commander Ghasemi issued two letters on IRGC letterhead, addressed to RPP and OGC Victoria, respectively, instructing that $12 million in U.S. dollars from two shipments be deposited in Baslam Nakliyat's bank account.

xxii.    On or about November 21, 2021, an employee of the ASB Group, a co-conspirator not named as a defendant herein ("CC-7"), received an email attaching a spreadsheet with the filename "Baslam_Ltd. (1).xlsx" reflecting financial transactions relating to approximately 28 "transfers," which appear to include sales of crude oil and petroleum products. Transfers 5 through 10 reflected payments from OGC Victoria between approximately February and March 2021 totaling approximately €14 million.

b.    Beginning in approximately 2020, SHAHRIYARI, KARIMIAN, Commander Ghasemi, and others orchestrated the sale of Iranian crude oil and petrochemicals to Russia, Uzbekistan, and elsewhere, using the U.A.E. company CGN Trade and its affiliate, Solise Energy, as intermediaries.

i.    On or about June 29, 2020, KARIMIAN received: (i) an electronic copy of a Certificate of Origin, purportedly from the Baghdad Chamber of Commerce, for 70,000 metric tons of purportedly Iraqi light crude oil originating from Baji Oil Refinery destined for "Uzbekistan via Caspian Sea through of Railway Transit," and which identified the

"Carrier" as "Oil tanker"; (ii) a datasheet for the characteristics of light crude oil from the Baji Oil Refinery dated May 1, 2020; and (iii) a draft invoice from CGN Trade to Bukhara Oil Refinery in Uzbekistan for the transport of 5,600 metric tons of purportedly Iraqi crude oil, by a named company ("Uzbek Company-1"). The transport invoice was priced in U.S. dollars and provided for payment to a CGN Trade account held in Dubai, United Arab Emirates, with the correspondent bank identified as a named U.S. bank located in New York, New York ("U.S. Bank-1"). The Certificate of Origin, datasheet, and draft invoice were designed to falsely represent Iranian origin oil as Iraqi origin because of sanctions relating to NIOC and Iran.

      ii.     On or about July 1, 2020, KARIMIAN received an electronic copy of a Certificate on NIOC letterhead advising that CGN Trade was loading light crude oil from Amirabad, Iran, for transit from Kazakhstan to Uzbekistan by Uzbek Company-1.

      iii.     On or about July 3, 2020, KARIMIAN received a message nominating KARIMIAN's company as agents of the *Caspian Sprinter*, an oil tanker, which was calling on the Iranian port of Amirabad for loading crude oil between approximately July 6 and 10, 2020. The nomination was made by Resource Tanker LLC, a company with a phone number having a Russia country code.

      iv.     On or about July 8, 2020, KARIMIAN received electronic copies of two letters on CGN Trade letterhead. The first letter was addressed to Baslam Nakliyat and identified an Iranian inspection company ("Iranian Inspection Company-1") as the inspector. The second letter was addressed to Iranian Inspection Company-1 and requested that Iranian Inspection Company-1 conduct oil inspections for loading oil on ships at Neka Oil Terminal, an oil terminal on Iran's Caspian Sea coastline near Amirabad.

v.      On or about July 10, 2020, KARIMIAN received an electronic copy of Iranian Inspection Company-1's final load report for the *Caspian Sprinter*, showing that the tanker was loaded with approximately 5,739 metric tons of crude oil at Neka Oil Terminal in Iran between approximately July 9 and 10, 2020.

vi.      Also on or about July 10, 2020, KARIMIAN sent an invoice that was issued by CGN Trade to Bukhara Oil Refinery in Uzbekistan in the amount of approximately $211,253 for the transport of approximately 5,739 metric tons of purportedly Iraqi crude oil by Uzbek Company-1. The invoice provided for payment to a CGN Trade bank account held in Dubai, with U.S. Bank-1 as the correspondent bank.

vii.      Also on or about July 10, 2020, KARIMIAN received an email chain discussing the arrival of the *Caspian Sprinter* at Amirabad and subsequent relocation to Neka Oil Terminal to load crude oil, and attaching a draft bill of lading identifying, among other things, CGN as the shipper, Uzbek Company-1 as the consignee, and a named company located in Russia as the ship owner ("Russian Company-1"). The email chain included emails sent by a representative of Russian Company-1.

viii.      On or about July 11, 2020, KARIMIAN sent the master of the *Caspian Sprinter* an analysis report purporting that the vessel was loaded with Iraqi crude oil, although the vessel had loaded crude oil from an Iranian oil terminal.

ix.      On or about July 13, 2020, KARIMIAN received a daily progress report from the master of the *Caspian Sprinter* advising that the vessel's last port was Neka in Iran and its next port was Aktay, a reference to the port city Aktau, Kazakhstan.

x.      Between approximately July 7 and 12, 2020, the AIS for the *Caspian Sprinter* was not broadcasting.

xi.     On or about July 16, 2020, KARIMIAN received a daily progress report from the master of the *Caspian Sprinter* advising that the vessel's last port was Aktau, Kazakhstan and its next port was Neka in Iran.

xii.     On or about November 8, 2020, KARIMIAN received a copy of a letter on CGN Trade letterhead addressed to Commander Rostam Ghasemi.  The letter referred to "our meeting held in Tehran recently," where it was "agreed to establish a new company which will be jointly owned between CGN [Trade] and [a named U.A.E. company ("U.A.E. Company-1")], the Emirati side."  The letter advised that "the company has been established in line with our agreement in Tehran, that the CGN [Trade] will be the trustee and represent the seller's interest."  The letter requested "a laycan [delivery window] for our first shipment along with the supply contract to be signed between you and us."

xiii.     On or about November 9, 2020, KARIMIAN received a copy of a "Spot Deal Contract" dated October 25, 2020, between Solise Energy and a company having an address in Dubai ("U.A.E. Company-2") for Solise Energy to sell purportedly Omani-origin bitumen (a form of petroleum) to U.A.E. Company-2 to be delivered to one or more nominated ports or ship-to-ship transfer points by U.A.E. Company-2 or U.A.E. Company-2's client in China.

xiv.     On or about December 3, 2020, KARIMIAN received a copy of a Cooperative Agreement, dated October 25, 2020, between Solise Energy and U.A.E. Company-2 to explore projects in petroleum products, oil and gas, bitumen, logistics, shipping, storage management, export and import, processing the product, and blending within the Middle East, Far East, and Gulf Coast Countries.

c.      On or about December 8, 2020, KARIMIAN received an electronic copy of a letter addressed to CC-6 concerning deliveries of light crude oil to Russia for the domestic Russian market or for transit to Europe.  The letter noted a number of limitations for these activities, including, among other things, refusals from banks, ship carriers, and consumers due to "fear of possible sanctions;" and a refusal by one Russian port "due to the risk of sanctions."

d.      On or about December 8, 2020, KARIMIAN also received an outline of a "Cooperation proposal" for three oil ventures: (1) delivery to the Russian domestic market, with a proposed monthly supply of 20,000 tons of crude oil between December 2020 and March 2021; (2) processing crude oil at Russian refineries for export to Europe, with a proposed monthly supply of 25,000 tons between January and December 2021; and (3) delivery of crude oil to Azerbaijan.

e.      Beginning in approximately 2020, SHAHRIYARI, KARIMIAN, SITKI AYAN, and others laundered the proceeds of Iranian crude oil and petrochemicals sales using CGN Trade and the Turkish company Rain Trade.  The Iranian oil proceeds were laundered using bulk cash deliveries and bank transfers.  For example:

i.      On or about October 9, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting the Turkish driver's license of Murat Teke, an ASB official designated as an SDN by OFAC on or about December 9, 2022 pursuant to Executive Order 13224 for having acted or purported to act for SITKI AYAN. The exchange also included Teke's signature acknowledging that he received €500,000 in cash from Rain Trade on or about October 9, 2020.

ii.      On or about October 16, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting Teke's Turkish driver's license and a note

ii.    On or about October 16, 2020, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting Teke's Turkish driver's license and a note stating that SITKI AYAN received $1 million U.S. dollars in cash, signed by Teke and OZTAS and dated October 16, 2020.

iii.    On or about March 23, 2021, KARIMIAN sent SHAHRIYARI a voice note asking for the ID of the person who would be collecting the money.

iv.    On or about April 1, 2021, SHAHRIYARI and KARIMIAN exchanged an electronic copy of an Istanbul, Turkey Chamber of Commerce registration for Rain Trade.

v.    On or about April 8, 2021, SHAHRIYARI and KARIMIAN exchanged a photograph of wire transfer instructions for the transfer of approximately €500,000 from Baslam Nakliyat to Rain Trade.

vi.    On or about April 9, 2021, SHAHRIYARI and KARIMIAN exchanged an electronic copy of a draft contract for Rain Trade to buy various agricultural products from an unidentified seller.

vii.    On or about April 12, 2021, SHAHRIYARI and KARIMIAN exchanged a photograph of wire transfer instructions for the transfer of approximately €1 million from Baslam Nakliyat to Rain Trade.

viii.    On or about April 15, 2021, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting the Turkish driver's license of an individual ("Individual-1"), and a note stating that Individual-1 had received approximately $1.25 million U.S. dollars in cash from CGN Trade, bearing Individual-1's signature and dated April 15, 2021.

ix.    On or about April 28, 2021, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting Individual-1's Turkish driver's license and a note stating that Individual-1 had received approximately $1 million U.S. dollars in cash from CGN Trade, bearing Individual-1's signature and dated April 28, 2021.

x.    On or about May 25, 2021, SHAHRIYARI and KARIMIAN exchanged an electronic image depicting Individual-1's Turkish driver's license and a note stating that Teke received approximately $1.075 million U.S. dollars in cash from CGN Trade, bearing Individual-1's signature and dated May 25, 2021.

### Additional Uses of the United States Financial System in Furtherance of the Oil-Laundering Scheme

40.    CGN Trade sent or received international wires totaling at least approximately $12.9 million between approximately February 2020 and November 2021, which were processed through a correspondent account held at U.S. Bank-1 in New York, New York, including the wires described below.

a.    On or about July 7, 2020, CGN Trade sent a wire totaling approximately $119,700 to Uzbek Company-1. On or about September 17, 2020, Uzbek Company-1 sent a wire totaling approximately $68,845 to CGN Trade. Both wires were processed through a correspondent account held at U.S. Bank-1 in New York, New York.

b.    On or about September 8, 2020, CGN Trade sent two wires of approximately $93,000 and $123,875 to Russian Company-1 in Russia. Both wires were processed through a correspondent account held at U.S. Bank-1 in New York, New York.

41.    On or about October 13, 2020, BAHADDIN AYAN, the defendant, caused a wire transfer of approximately $410,000 from his account in Turkey to an account held by Baslam Petrol in Turkey, in connection with the *Oman Pride*'s transportation of Iranian crude oil.

The wire transfer was processed through a correspondent bank account held at a U.S. bank located in New York, New York ("U.S. Bank-2").

42.    On or about October 14, 2020, BAHADDIN AYAN caused a wire transfer of approximately $1,002,000 from his account in Turkey to an account held by Baslam Petrol in Turkey, in connection with the *Oman Pride*'s transportation of Iranian crude oil. The wire transfer was processed through a correspondent bank account held at U.S. Bank-2.

43.    On or about October 14, 2020, after the two wire transfers from BAHADDIN AYAN, the defendant, described in paragraphs 40 and 41 above, Baslam Petrol transferred an amount in Euro equivalent to approximately $2,000,000 to Shipping Company-1 as payment for the transport of Iranian crude oil on board the *Carmen*.

44.    On or about October 27, 2020, BAHADDIN AYAN, the defendant, caused a wire transfer of approximately $3,500,000 in U.S. dollars from his account in Turkey to an account held by Baslam Petrol in Turkey, in connection with the *Oman Pride*'s transportation of Iranian crude oil. The wire transfer was processed through a correspondent bank account held at U.S. Bank-2.

45.    On or about October 27, 2020, after the wire transfer from BAHADDIN AYAN, the defendant, described in paragraph 43 above, Baslam Petrol transferred an amount of Euro equivalent to approximately $3,500,000 to Shipping Company-1.

46.    On or about March 16, 2021, a company located in China ("PRC Company-3") caused a wire transfer of approximately $9,096,000 in U.S. dollars from an account in China to an account held by Baslam Nakliyat in Turkey, in connection with the transfer of Iranian-origin oil. The wire transfer was processed through a correspondent bank account held at U.S. Bank-2.

47.     As alleged above, *supra* ¶ 39(a)(xxii), on or about November 21, 2021, CC-7, an employee of the ASB Group, received an email attaching a spreadsheet with the filename "Baslam_Ltd. (1).xlsx" reflecting financial transactions which appear to include sales of crude oil and petroleum products, designated as "transfers." Transfers 1, 2, and 3 reflect payments to Shipping Company-1 in October 2020, relating to the transport of Iranian crude oil on board the *Oman Pride* and the *Carmen*. The same spreadsheet of payments reflects an entry for a payment of approximately $9,095,409.49 in U.S. dollars from PRC Company-1 on or about March 16, 2021 for "Transfer 11."

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Provide Material Support to
### a Foreign Terrorist Organization)

The Grand Jury charges:

48.     The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as if fully set forth herein.

49.     From at least on or about April 15, 2019, up to and including the date of this Indictment, in the Southern District of New York and elsewhere, and in an offense begun and committed in Iran, Turkey, and elsewhere out of the jurisdiction of any particular State or district of the United States, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly combined, conspired,

confederated, and agreed together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b)(1), to a foreign terrorist organization, namely, the IRGC, which was designated by the United States Secretary of State as a foreign terrorist organization on or about April 15, 2019 pursuant to Section 219 of the Immigration and Nationality Act, and is currently designated as such as of the date of the filing of this Indictment.

       50.    It was a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did provide the IRGC with material support and resources, to wit, services, property, and personnel, knowing that the IRGC was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that the IRGC engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that the IRGC engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

(Title 18, United States Code, Sections 2339B(a)(1), (d)(1)(C), (d)(1)(D), (d)(1)(E) & (d)(1)(F), and 3238.)

## COUNT TWO
### (Conspiracy to Violate the
### International Emergency Economic Powers Act)

The Grand Jury further charges:

51.    The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as if fully set forth herein.

### The International Emergency Economic Powers Act

52.    The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 to 1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this title."  50 U.S.C. § 1705(a).

53.    Beginning with Executive Order 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States" and declared "a national emergency to deal with that threat."  That finding of a national emergency was most recently continued on November 7, 2023.  The President has declared additional national emergencies with respect to the actions and policies of the Government of Iran which also remain in effect.

### The Iranian Transactions and Sanctions Regulations

54.    On March 15 and May 6, 1995, the President issued Executive Orders 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a U.S. person, and on August 19, 1997, issued Executive Order 13059 clarifying the previous orders.

These Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2013 the Iranian Transactions and Sanctions Regulations, or "ITSR"), implementing the sanctions imposed by the Executive Orders. The national emergency declared in these Executive Orders was most recently continued on March 10, 2023.

55.     Title 31, Code of Federal Regulations, Section 560.204 of the ITSR prohibits, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale, or supply of goods, technology, or services to a third country knowing that such goods, technology, or services are intended for Iran or the Government of Iran, without a license from OFAC.

56.     The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. <u>See</u> 31 C.F.R. § 560.427(a).

57.     The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. <u>See</u> 31 C.F.R. § 560.203.

### The Global Terrorism Sanctions Regulations

58.     On September 23, 2001, the President issued Executive Order 13224, providing that all property and interests in property in the United States of persons determined to have committed or to pose a significant risk of committing acts of terrorism that threaten U.S.

nationals or the national security, foreign policy, or economy of the United States, or determined to act for or on behalf of such persons or to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or such persons (SDGTs) is blocked.  Executive Order 13224 authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Order.  Pursuant to this authority, the Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations ("GTSR"), implementing the sanctions imposed by the Executive Order.

59.    Title 31, Code of Federal Regulations, Section 594.201(a) of the GTSR provides, in relevant part:

> [P]roperty and interests in property of [SDGTs] that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of U.S. persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in . . .

without a license from OFAC.

60.    Section 594.204 of the GTSR further prohibits any U.S. person from engaging in any transaction or dealing in property or interests in property of persons whose property or interests in property are blocked pursuant to the GTSR.

61.    Section 594.205 of the GTSR further prohibits attempts and conspiracies to violate or to evade the prohibitions of the GTSR.

62.    As alleged in paragraphs 18, 19, 20, 26, 27, 28, and 29, *supra*, the IRGC, IRGC-QF, NIOC, NITC, Commander Ghasemi, and BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, and

MOHAMMAD SADEGH KARIMIAN, the defendants, each has been designated as an SDGT pursuant to Executive Order 13224.

### The Weapons of Mass Destruction
### Proliferators Sanctions Regulations

63.     On June 28, 2005, the President issued Executive Order 13382, providing that all property and interests in property in the United States of persons determined to have engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery, is blocked. Executive Order 13382 authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Order. Pursuant to this authority, the Secretary of the Treasury promulgated the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMD Sanctions"), implementing the sanctions imposed by the Executive Order.

64.     Title 31, Code of Federal Regulations, Section 544.201 provides, in relevant part:

> [A]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, of [persons designated pursuant to Executive Order 13382] are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . .

without a license from OFAC.

65.     Section 544.205 of the WMD Sanctions further prohibits attempts and conspiracies to violate, the WMD Sanctions, or any transaction by a U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, the prohibitions of the WMD Sanctions.

66.    As alleged in paragraphs 17, 22, and 25, *supra*, Commander Ghasemi, the IRGC, and SAPID each has been designated as an SDN pursuant to Executive Order 13382.

## The Iranian Financial Sanctions Regulations

67.    On December 11, 2011, the National Defense Authorization Act for Fiscal Year 2012 was enacted (the "2012 NDAA"), requiring the imposition of sanctions on foreign financial institutions -- including banks and money service businesses, among others -- following a determination by the President that a foreign financial institution violated certain prohibitions with respect to the Central Bank of Iran or another Iranian financial institution designated under the IEEPA. These prohibitions applied to government-owned foreign financial institutions with respect to transactions for the sale or purchase of petroleum or petroleum products to or from Iran conducted or facilitated on or after 180 days from the enactment of the 2012 NDAA, unless the foreign country significantly reduced its volume of petroleum and petroleum products purchased from Iran. These prohibitions included an exception for transactions for the sale of food, medicine, or medical devices to Iran.

68.    On July 30, 2012, the President issued Executive Order 13622 to take additional steps with respect to the national emergency declared in Executive Order 12957 and the 2012 NDAA. The President, among other things, imposed additional restrictions with respect to the sale of Iranian petroleum and petroleum products, authorizing the Secretary of the Treasury to impose sanctions on a foreign financial institution that knowingly conducted or facilitated any significant financial transaction with NIOC, NICO, or the Central Bank of Iran, or for the purchase or acquisition of petroleum or petroleum products from Iran, unless the President determined the foreign country had significantly reduced its volume of petroleum and petroleum products purchased from Iran pursuant to the 2012 NDAA. The available sanctions included prohibitions

and conditions on opening or maintaining U.S. correspondent and payable-through accounts of the foreign financial institution.

69.    Executive Order 13622 also authorized the Secretary of the Treasury to block property and property interests in the United States of any person who "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC, NICO, or the Central Bank of Iran, or the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran." Executive Order 13622 prohibited any transaction that evaded or avoided, had the purpose of evading or avoiding, caused a violation of, or attempted to violate any of the prohibitions set forth in that order.

70.    On or about January 16, 2016, Executive Order 13622, among others, was revoked pursuant to the Joint Comprehensive Plan of Action ("JCPOA") between the United States, Iran, and other nations, which, in substance, provided certain sanctions relief to the Government of Iran in exchange for certain commitments by the Government of Iran with respect to nuclear development. On May 8, 2018, the President found that the United States' participation in the JCPOA was not in the national interest, citing among other reasons that, since the JCPOA's inception, Iran had only escalated its destabilizing activities in the surrounding region. On August 6, 2018, Executive Order 13846 reversed the revocation of Executive Order 13622 and imposed additional sanctions with respect to the trade in Iranian petroleum and petroleum products.

71.    OFAC adopted the Iranian Financial Sanctions Regulations ("IFSR"), Title 31, Code of Federal Regulations, Part 561, to implement various sanctions against the Government of Iran, NIOC, and the IRGC, among others. The IFSR authorize the Secretary of the Treasury to, among other things:

a.      Impose sanctions on a foreign financial institution that knowingly facilitates a significant transaction or transactions, or provides significant financial services for, the IRGC or any of its agents or affiliates whose property and interests in property are blocked pursuant to the IEEPA; or any person whose property and interests in property are blocked pursuant to the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations or the GTSR, 31 C.F.R. § 561.201(a)(5); or that knowingly facilitates, or participates or assists in, such activity, including by acting on behalf of, at the direction of, or as an intermediary for another person.

b.      Impose sanctions on a foreign financial institution that knowingly conducts or facilitates any significant financial transaction with NIOC or any entity owned or controlled by NIOC (except for certain transactions not at issue here) or any transaction for the purchase or acquisition of petroleum, petroleum products, or petrochemical products from Iran. 31 C.F.R. § 561.204(b).

72.      The IFSR prohibit any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of its prohibitions, and any conspiracy to violate any of its prohibitions.  31 C.F.R. § 561.220.

### The Syria Sanctions Regulations

73.      On August 18, 2011, the President issued Executive Order 13582, taking additional steps with respect to the Government of Syria's continuing escalation of violence against the people of Syria and with respect to the national emergency declared in Executive Orders 13338, 13399, 13460, 135872, and 13573, including (i) blocking any property or interests in property of the Government of Syria in the United States or in the custody or possession of any U.S. person; and (ii) prohibiting, among other things, the exportation, reexportation, sale, or

supply, directly or indirectly, to Syria of any goods, technology, or services from the United States or by a U.S. person. These Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Syrian Sanctions Regulations ("SSR"), Title 31, Code of Federal Regulations, Part 542, implementing the sanctions imposed by the Executive Orders.

74.    Title 31, Code of Federal Regulations, Section 542.201(a) of the SSR provides in relevant part that:

> [P]roperty and interests in property that are in the United States, that come within the United States, or that are or come within the possession or control of any United States person, including any foreign branch, of the Government of Syria . . . may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . .

without a license from OFAC.

75.    Title 31, Code of Federal Regulations, Section 542.207 of the SSR prohibits the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a U.S. person, of any services to Syria without a license from OFAC.

76.    Title 31, Code of Federal Regulations, Section 542.205 of the SSR prohibits any transaction by a U.S. person or within the United States that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions in the SSR, and any conspiracy to violate any of the prohibitions in the SSR.

## Statutory Allegations

77.    From at least in or about 2018 up to and including the date of this Indictment, in the Southern District of New York and elsewhere, and in an offense begun and committed in Iran, Turkey, and elsewhere out of the jurisdiction of any particular State or district of the United States, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain,"

a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the IEEPA.

78.    It was a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did cause U.S. persons to engage in transactions and dealings in property and interests in property of persons whose property and interests in property are blocked pursuant to the GTSR, namely, the IRGC, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to transactions and dealings in property and interests in property of the IRGC, in violation of Executive Order 13224 and Title 31, Code of Federal Regulations, Sections 594.201, 594.204, and 594.205.

79.    It was further a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and

others known and unknown, would and did cause dealings in, transfers, payments, exports, and withdrawals of property and interests in property of persons whose property and interests in property are blocked pursuant to the WMD Sanctions, namely, ROSTAM GHASEMI, the IRGC, and SAPID, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to transactions and dealings in property and interests in property of ROSTAM GHASEMI, the IRGC, and SAPID, in violation of Executive Order 13382 and Title 31, Code of Federal Regulations, Sections 544.201 and 544.205.

80.     It was further a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did provide and cause others to provide services to Iran and to the Government of Iran from the United States and by U.S. persons, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to the provision of services to Iran and to the Government of Iran from the United States and by U.S. persons, in violation of Executive Orders 12959, 13059, and 13224; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205.

81.     It was further a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and

others known and unknown, would and did provide and cause others to provide services to Syria and to the Government of Syria from the United States and by U.S. persons, and to cause transactions and dealings in property and interests in property of the Government of Syria in the United States and by U. S. persons, without first obtaining the required approval of OFAC; and to evade the requirements of U.S. law with respect to the provision of services to Syria and to the Government of Syria from the United States and by U.S. persons and dealings in property and interests in property of the Government of Syria in the United States and in the possession or custody of U.S. persons, in violation of Executive Order 13582 and Title 31, Code of Federal Regulations, Sections 542.201, 542.205, and 542.207.

(Title 50, United States Code, Section 1705;
Executive Orders 12959, 13059, 13224, 13382, & 13582; Title 31, Code of Federal Regulations, Sections 542.201, 542.205, 542.207, 544.201, 544.205, 560.203, 560.204, 560.205, 594.201, 594.204, & 594.205; Title 18, United States Code, Section 3238.)

## COUNT THREE
### (Conspiracy to Commit Bank and Wire Fraud)

The Grand Jury further charges:

82.    The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as if fully set forth herein.

83.    From at least in or about 2018 up to and including the date of this Indictment, in the Southern District of New York and elsewhere, and in an offense begun and committed in Iran, Turkey, and elsewhere out of the jurisdiction of any particular State or district of the United States, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM

OZTAS, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, and wire fraud, in violation of Title 18, United States Code, Section 1343.

84.    It was a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation ("FDIC"), in violation of Title 18, United States Code, Section 1344.

85.    It was further a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did knowingly execute and attempt to execute a scheme or artifice to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution, the deposits of which were then insured by the FDIC, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

86.     It was further a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, having devised and intending to devise a scheme or artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3238.)

## COUNT FOUR
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

87.     The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as if fully set forth herein.

88.     From at least in or about 2018 up to and including the date of this Indictment, in the Southern District of New York and elsewhere, and in an offense begun and committed in Iran, Turkey, and elsewhere out of the jurisdiction of any particular State or district of the United States, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, at least one of whom is expected to be

first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

89.    It was a part and an object of the conspiracy that BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds to places in the United States from and through places outside the United States, and to places outside the United States from and through places in the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity, to wit, (a) the conspiracy to illegally export services to Iran and Syria and to deal in and cause dealings and transactions in blocked property of NIOC and the IRGC in violation of the IEEPA as charged in Count Two of this Indictment, and (b) the conspiracy to commit bank and wire fraud as charged in Count Three of this Indictment, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h), 1956(f), and 3238.)

## COUNT FIVE
### (Conspiracy to Defraud the United States)

The Grand Jury further charges:

90.    The allegations contained in paragraphs 1 through 47 of this Indictment are repeated and realleged as if fully set forth herein.

91.     From at least in or about 2018 up to and including the date of this Indictment, in the Southern District of New York and elsewhere, and in an offense begun and committed in Iran, Turkey, and elsewhere out of the jurisdiction of any particular State or district of the United States, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to defraud the United States and an agency thereof, to wit, to impair, impede, and obstruct the lawful and legitimate governmental functions and operations of the U.S. Department of the Treasury in the enforcement of national security sanctions and controls and regulations administered by that agency.

## Overt Acts

92.     In furtherance of the conspiracy and to effect the illegal object thereof, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, and their co-conspirators committed, among others, the overt acts alleged in paragraphs 1 through 47 above.

(Title 18, United States Code, Sections 371 and 3238.)

## FORFEITURE ALLEGATION
### (Count One)

93.    As a result of committing the terrorism offense alleged in Count One of this Indictment, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(G) and 2332b(g)(5), and Title 28, United States Code, Section 2461:

a.    all right, title, and interest in all assets, foreign and domestic;

b.    all right, title, and interest in all assets, foreign and domestic, affording a source of influence over the IRGC;

c.    all right, title, and interest in all assets, foreign and domestic, acquired and maintained with the intent and for the purpose of supporting, planning, conducting, and concealing a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property; and

d.    all right, title, and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property;

including, but not limited to, a sum of money representing the value of the property described above as being subject to forfeiture.

## FORFEITURE ALLEGATION
### (Counts Two and Three)

94.    As a result of committing the IEEPA and bank and wire fraud offenses alleged in Counts Two and Three of this Indictment, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a "Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a

"Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN,

BAHADDIN AYAN, and KASIM OZTAS, the defendants, shall forfeit to the United States,

pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28,

United States Code, Section 2461, all property, real and personal, that constitutes or is derived

from proceeds traceable to the commission of the offenses alleged in Counts Two and Three of

this Indictment, including but not limited to a sum of money representing the amount of proceeds

obtained as a result of the offenses.

### Substitute Assets Provision

95.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

  a)     cannot be located upon the exercise of due diligence;

  b)     has been transferred or sold to, or deposited with, a third person;

  c)     has been placed beyond the jurisdiction of the court;

  d)     has been substantially diminished in value; or

  e)     has been commingled with other property which cannot be
         subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said

defendants up to the value of the above forfeitable property.

### FORFEITURE ALLEGATION
### (Count Four)

96.     As a result of committing the money laundering offense alleged in Count

Four of this Indictment, BEHNAM SHAHRIYARI, a/k/a "Seyed Aliakbar Mirvakili," a/k/a

"Husain," a/k/a "Huseyini Hamid," a/k/a "Seyed Hamid Reza Shahcheraghi," MORTEZA

ROSTAM GHASEMI, MOHAMMADREZA ALIAKBARI, a/k/a "Captain Aliakbari," a/k/a "Abu Emad," MOHAMMAD SADEGH KARIMIAN, SITKI AYAN, BAHADDIN AYAN, and KASIM OZTAS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the money laundering offense and all property traceable to such property, including but not limited to, a sum of money representing the amount of property that was involved in the money laundering offense or is traceable to such property.

### Substitute Assets Provision

97.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a)     cannot be located upon the exercise of due diligence;

b)     has been transferred or sold to, or deposited with, a third person;

c)     has been placed beyond the jurisdiction of the court;

d)     has been substantially diminished in value; or

e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

_____
Foreperson

_____
DAMIAN WILLIAMS
United States Attorney